TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-02-00569-CV







City of Abilene, Texas; City of San Angelo, Texas; and City of Vernon, Texas, Appellants



v.



Public Utility Commission of Texas and West Texas Utilities Company, Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT

NO. GV200052, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING






M E M O R A N D U M O P I N I O N



 The cities of Abilene, San Angelo, and Vernon (collectively, "Cities") appeal a
district court judgment upholding a Public Utility Commission order approving West Texas Utilities
Company's ("WTU") application for approval of unbundled cost of service rates. In two points of
error, the Cities specifically oppose that part of the order imposing an eighty percent demand ratchet
for transmission and distribution rates on municipal water pumping customers. The Cities contend
that the demand ratchet unreasonably discriminates against municipal water pumping customers
because they are similarly situated to seasonal agricultural customers, who received the exemption. 
The Cities further contend that the Commission's failure to grant the exemption to municipal water
pumping customers was arbitrary and capricious. For the reasons stated below, we affirm the
judgment of the district court.


FACTUAL AND PROCEDURAL BACKGROUND In 1999, the legislature amended the Public Utility Regulatory Act ("PURA") (1) to
establish competition in the retail market for electricity, beginning January 1, 2002. It enacted
chapter 39 of PURA "to protect the public interest during the transition to and in the establishment
of a fully competitive electric power industry." Tex. Util. Code Ann. § 39.001(a) (West Supp.
2003). As part of the utility industry deregulation, the legislature created a statutory scheme whereby
the regulated utility industry would be separated or "unbundled" into three distinct entities: (1) power
generation companies; (2) retail electric providers; and (3) transmission and distribution utilities. 
Id. § 39.051 (West Supp. 2003). This case concerns WTU's transmission and distribution rates.

 Utilities, including WTU, submitted applications for approval of unbundled costs of
service, with the Commission still regulating the transmission and distribution rates. In re TXU Elec.
Co., 67 S.W.3d 130, 132 (Tex. 2001) ("Because the generating companies and retail electric
providers must use the existing power lines to move electricity from the plant to the retail customer
. . ., the transmission and delivery companies . . . remain regulated monopolies."). With some
transmission and distribution rate issues common to all of the applications, the Commission held a 
proceeding to determine the common issues ("generic proceeding") and issued an interim order
establishing customer classifications and rate designs for all transmission and distribution rates. (2) 
Included in the order was a provision imposing an eighty percent demand ratchet (3) on transmission
and distribution rates for customers with electric meters that tracked demand. The order exempted
seasonal agricultural customers from the demand ratchet based on evidence that the ratchet would
overburden cotton ginners, because they operated only sixty to ninety days per year and used very
little electricity for the rest of the year. (4)

 The Commission denied other customers' applications for exemption from the
demand ratchet and determined that it would consider their applications in the utilities' individual
ratemaking proceedings. The Commission would consider exemptions to the generic rate design
"only if necessary to address extraordinary impacts on the ability of customers to obtain service from
a competitive provider due to the restrictions of the price to beat (i.e., 'headroom' concerns)." (5) The
order went on to state that "because the transmission and distribution rates . . . represent a relatively
small proportion of an end-use customer's bill, the design of such rates shall be amended only in the
case of exceptional headroom concerns. Such headroom concerns should not automatically mandate
the granting of an exception to the generic rate design."

 The Cities, who were customers of WTU and other utilities, sought an exemption
from the demand ratchet in WTU's individual ratemaking proceeding ("WTU proceeding"). (6) The
Cities' basis for entitlement to the exemption was that the municipal water pumping customers'
variable electrical demand was similar to the cotton ginners' variable demands. Imposing a demand
ratchet on this variable demand would cause lower headroom, putting the municipal water pumping
customers at a disadvantage in seeking competitive electrical rates. The Commission determined
that it would not expand the demand ratchet exemption to include municipal water pumping
customers because the expansion "is not warranted on the basis of extraordinary headroom
concerns."

 The Cities sought review of the WTU proceeding order in a Travis County district
court, which affirmed the Commission's order. In two points of error, the Cities appeal the judgment
of the district court. They contend in their first point of error that the Commission's unequal rate
treatment of cotton ginners and municipal water pumping customers constitutes unreasonable
discrimination in ratemaking, in violation of PURA section 36.003. See Tex. Util. Code Ann.
§ 36.003(c) (West 1998) (a utility may not grant an "unreasonable preference or advantage
concerning rates" or "subject a person in a classification to an unreasonable prejudice or
disadvantage concerning rates"). They contend in their second point of error that the Commission
acted arbitrarily and capriciously by applying a "different, vague standard" to municipal water
pumping customers than the standard applied to the cotton ginners.


STANDARD OF REVIEW

 The parties disagree about which standard of review applies. The Cities urge that we
apply an arbitrary and capricious standard of review. The Commission and WTU contend that we
are required to apply a substantial evidence standard of review. Both assertions are correct in part
because the Cities' two points of error require different standards of review.

 In their first point of error, the Cities contend that the Commission failed to identify
substantial differences between municipal water pumping customers and cotton ginners to justify
disparate rate treatment and thus that the Commission unreasonably discriminated against the
municipal water pumping customers. In other words, the Cities assert that substantial evidence does
not support the Commission's decision in the WTU proceeding not to grant an exemption to the
municipal water pumping customers. Therefore, we will review the Cities' unreasonable
discrimination challenge under a substantial evidence standard of review. (7)

 We must uphold an agency action unless we find, among other factors, that the action
is "[n]ot reasonably supported by substantial evidence considering the reliable and probative
evidence in the record as a whole" or is "arbitrary or capricious or characterized by abuse of
discretion or clearly unwarranted exercise of discretion." Tex. Gov't Code Ann. § 2001.174(2)(e),
(f) (West 2000). Under substantial evidence review, we may not substitute our judgment as to the
weight of the evidence for that of the agency. Texas Health Facilities Comm'n v. Charter
Med.-Dallas, Inc., 665 S.W.2d 446, 452 (Tex. 1984). We must first determine whether the evidence
as a whole is such that reasonable minds could have reached the conclusion that the agency must
have reached to take the disputed action. Texas State Bd. of Dental Exam'rs v. Sizemore, 759
S.W.2d 114, 116 (Tex. 1988); Ramirez v. Texas State Bd. of Med. Exam'rs, 995 S.W.2d 915, 919
(Tex. App.--Austin 1999, pet. denied). The test is not whether the agency made the correct
conclusion but whether some reasonable basis exists in the record for the agency's action. Railroad
Comm'n v. Pend Oreille Oil & Gas Co., 817 S.W.2d 36, 41 (Tex. 1991); Charter Med.-Dallas, Inc.,
665 S.W.2d at 452. Nevertheless, even after applying a substantial evidence standard of review, we
must ensure that the actions of the Commission were not arbitrary and capricious. Agency decisions
not supported by substantial evidence are deemed to be arbitrary and capricious. Charter
Med.-Dallas, Inc., 665 S.W.2d at 454.

 In their second point of error, the Cities contend that the Commission arbitrarily and
capriciously applied a different, vague standard in denying an exemption to the municipal water
pumping customers. We will thus evaluate the Cities' second point of error under an arbitrary and
capricious standard of review, which is limited and deferential. Pedernales Elec. Co-op., Inc. v.
Public Util. Comm'n, 809 S.W.2d 332, 338 (Tex. App.--Austin 1991, no writ). Examples of
Commission conduct found to be arbitrary and capricious include: basing a decision on legally
irrelevant factors or failing to consider statutorily-mandated relevant factors in making an agency's
decision, Consumers Water, Inc. v. Public Utility Commission, 774 S.W.2d 719, 721 (Tex.
App.--Austin 1989, no writ); granting a certificate of service to a public utility for a reason other
than the statutorily defined reasons, Public Utility Commission v. South Plains Electric Cooperative,
Inc., 635 S.W.2d 954, 957 (Tex. App.--Austin 1982, writ ref'd n.r.e.); in denying a permit, relying
on additional requirements "neither expected by [the applicant] nor proposed by the Board's staff,"
Starr County v. Starr Industrial Services, Inc., 584 S.W.2d 352, 356 (Tex. Civ. App.--Austin 1979,
writ ref'd n.r.e.).


ANALYSIS

 In their first point of error, the Cities contend that the Commission, in violation of
PURA, unreasonably discriminated against municipal water pumping customers in the WTU
proceeding by not granting to them the same demand ratchet exemption that the cotton ginners
received. Through PURA, the Commission "has broad powers and discretion in regulating public
utilities." Public Util. Comm'n v. GTE-Southwest, Inc., 901 S.W.2d 401, 409 (Tex. 1995). The
Commission's construction of PURA is entitled to great weight as long as it does not contradict the
plain language of the statute. El Paso Elec. Co. v. Public Util. Comm'n, 917 S.W.2d 846, 856 (Tex.
App.--Austin 1995, writ dism'd by agr.).

 PURA gives the Commission the authority to set transmission and distribution utility
rates. See Tex. Util. Code Ann. § 39.201 (West Supp. 2003). In setting these rates, the Commission
may not


(1) grant an unreasonable preference or advantage concerning rates to a person in
a classification;


(2) subject a person in a classification to an unreasonable prejudice or disadvantage
concerning rates; or


(3) establish or maintain an unreasonable difference concerning rates between
localities or between classes of service.



Id. § 36.003(c); see Amtel Communications, Inc. v. Public Util. Comm'n, 687 S.W.2d 95, 101 (Tex.
App.--Austin 1985, no writ). Some differentiation in treatment may be warranted in some
circumstances. See City of El Paso v. Public Util. Comm'n, 839 S.W.2d 895, 932-33 (Tex.
App.--Austin 1992), aff'd in part, rev'd in part on other grounds, 883 S.W.2d 179 (Tex. 1994)
(Commission's assignment of university to a different rate class than city and county not an abuse
of discretion, because university failed to prove similar load characteristics). In those instances,
unequal treatment neither violates PURA nor invalidates an agency action. Amtel, 687 S.W.2d at
101. The burden of proving unreasonable discrimination is on the party asserting the claim. AT &
T Communications of the Southwest, Inc. v. Public Util. Comm'n, 906 S.W.2d 209, 213-14 n.7 (Tex.
App.--Austin 1995, writ denied). It is not enough for a claimant to show that the difference in rates
results in unequal treatment. Amtel, 687 S.W.2d at 103.

 If the Commission sets different rates for customers who are similarly situated, it
must base its disparate treatment on substantial and reasonable differences between the customers. 
AT & T Communications, 906 S.W.2d at 213-14 n.7; Amtel, 687 S.W.2d at 102. Factors for
distinctions between customers include quantity of service received, different characteristics of
service, time of use, "or any other matter which presents a substantial difference as a ground of
distinction." Amtel, 687 S.W.2d at 102 (quoting Caldwell v. City of Abilene, 260 S.W.2d 712, 714
(Tex. Civ. App.--Eastland 1953, writ ref'd)). Whether the differences are reasonable is a fact
determination, and the burden of proof is on the complaining party. Id. (citing Ford v. Rio Grande
Valley Gas Co., 174 S.W.2d 479, 480 (Tex. 1943)).

 The Cities do not challenge the eighty percent demand ratchet or the Commission's
grant of an exemption from the ratchet to the cotton ginners in the generic proceeding. The Cities
instead urge that, based on WTU data concerning electrical demands and headroom, the municipal
water pumping customers deserve the same exemption in the WTU proceeding because they are
similarly situated to the cotton ginners. They then contend that the Commission's unequal rate
treatment of the two groups was unjustified because the Commission failed to identify substantial
differences between the groups. We disagree. Even assuming that the groups are similarly situated,
we find substantial evidence of a "substantial and reasonable difference" between the groups, which
justifies the unequal rate treatment.

 We begin by dismissing the Cities' claim that, because they are in the same customer
classification, the municipal water pumping customers should receive the same treatment as cotton
ginners. To the contrary, utility rates may vary within a classification of customers if the variations
are reasonable. See Tex. Util. Code Ann. § 36.003(c)(1); Amtel, 687 S.W.2d at 101-02.

 The Cities contend that the similarities in demand data demonstrate that the cotton
ginners and municipal water pumpers are similarly situated. For example, the cotton ginners' expert
witness testified that the demand ratchet would double or triple cotton ginners' transmission and
distribution rates. Imposing a demand ratchet on the cotton ginners would result "in a complete loss
of headroom" and deprive them "of the benefits of competition." The Cities' expert witness testified
similarly that "[c]ustomers with demands that vary month to month will experience an increase in
the demand for which they are billed"; one municipal water pumping customer--which "may be an
extreme example"--would pay 870 percent more for transmission and distribution rates with the
imposition of an 80 percent demand ratchet. The demand ratchet would thus result in a 414 percent
billing demand increase in WTU's transmission and distribution rates for municipal water pumping
customers.

 But the records in both the generic proceeding and the WTU proceeding show a
substantial difference between the two groups of customers. The cotton ginners' expert testified in
the generic proceeding that the cotton ginners use large amounts of electricity for sixty to ninety days
per year, with little or no use for the rest of the year. He further testified that the principal cause of
their rate increase would be demand-based billing for partial months of high demand or months in
which they had little or no electrical demand. The Commission found in both the generic proceeding
and the WTU proceeding that the cotton ginners were entitled to a demand ratchet exemption based
on their "highly variable usage patterns within the year" which were "unique." In the WTU
proceeding, the Cities' expert testified that the Cities would experience negative headroom because
of the demand ratchet on "demands that vary significantly from month to month," but he presented
no evidence of the demands being as variable as the cotton ginners' demands.

 The goal of the generic proceeding was to establish generic transmission and
distribution rates, with "uniform rate designs and customer classifications . . . appropriate and
necessary to achieve this goal." Therefore, a customer had to demonstrate "extraordinary headroom
concerns" to be exempt from the uniform rate design. But demonstration of reduced headroom does
not "automatically mandate the granting of an exception." In determining whether to grant an
exemption from the uniform rates, the Commission could compare a variety of distinctions between
the customers, including differences in the time of use "or any other matter which presents a
substantial difference as a ground of distinction." Amtel, 687 S.W.2d at 102 (quoting Caldwell, 260
S.W.2d at 714). In the generic proceeding, the Commission determined that the cotton ginners were
entitled to a demand ratchet exemption based on their "unique characteristics," supported by the
cotton ginners' expert testimony about high demands for sixty to ninety days and little electrical
usage throughout the rest of the year. The municipal water pumping customers did not demonstrate
such unique circumstances in the WTU proceeding, instead presenting evidence that their demands
"vary significantly from month to month." WTU's expert testified that because utilities base rate
designs "on an average basis," customers with variable demands will more likely experience
headroom concerns. The Commission gave notice to the Cities in the generic proceeding that merely
showing headroom concerns would not "automatically mandate the granting of an exception."

 The Commission's determination to grant a demand ratchet exemption to the cotton
ginners based on their "unique characteristics," and to deny the municipal water pumpers an
exemption based on testimony that their demands varied "significantly from month to month" and
based on findings of an "insignificant increase in demand billing" and a greater load than the class
average qualifies as a "substantial and reasonable" difference that justifies disparate rate treatment. 
Id. The Commission's decision in the WTU proceeding not to exempt municipal water pumping
customers from the demand ratchet was not an "unreasonable preference or advantage concerning
rates" to the cotton ginners. Tex. Util. Code Ann. § 36.003. Therefore, we overrule the Cities' first
point of error.

 In their second point of error, the Cities assert that the Commission arbitrarily and
capriciously applied a different, vague standard to the municipal water pumping customers' request
for an exemption from the demand ratchet. Under this limited and deferential standard of review,
we find that the Commission did not act arbitrarily or capriciously. See Pedernales Elec. Co-op.,
809 S.W.2d at 338. PURA grants the Commission considerable discretion in deciding rate design
issues. Texas Alarm & Signal Ass'n v. Public Util. Comm'n, 603 S.W.2d 766, 772 (Tex. 1980). As
long as the Commission addresses the rate considerations set forth in PURA, the particular factors
and the weight to be given those factors are within the Commission's discretion. Id. at 772-73; AT
& T Communications, 777 S.W.2d at 366. Under PURA section 36.003, the Commission may set
differing rates as long as the rates are not unreasonably discriminatory. See Texas Alarm & Signal,
603 S.W.2d at 770. Further, the Commission may consider a variety of factors in making rate design
decisions. See id. at 772.

 The Cities focus on the similarity of electrical demands and headroom concerns,
arguing that these similarities require the Commission to grant municipal water pumping customers
the same demand ratchet exemption that the cotton ginners received. But the Commission granted
an exemption to the cotton ginners because they had "highly variable usage patterns within the year"
which were "unique." (8) The cotton ginners, according to their expert, had "a relatively large quantity
of electricity during one portion of the year, and very little during the remainder of the year." The
municipal water pumping customers, on the other hand, had "demands that var[ied] significantly
from month to month." The municipal water pumping customers did not demonstrate the unique
circumstances as did the cotton ginners.

 The Cities further contend that "extraordinary headroom concerns" was a new
standard, applied after the cotton ginners received an exemption. The cotton ginners demonstrated
extraordinary headroom concerns in the generic proceeding, and we find no evidence in the record
that the Commission applied a "different, vague standard" to the municipal water pumping
customers in the WTU proceeding. The Commission followed the rate considerations set forth in
PURA and acted within its considerable discretion in granting the exemption only to the cotton
ginners. Texas Alarm & Signal, 603 S.W.2d at 772-73; AT & T Communications, 777 S.W.2d at
366. Therefore, we hold that the Commission did not act arbitrarily or capriciously in its
determination that a demand ratchet exemption for the municipal water pumping customers was "not
warranted on the basis of extraordinary headroom concerns." We overrule the Cities' second point
of error.



CONCLUSION

 We hold that the Commission's decision in the WTU proceeding not to expand the
eighty percent demand ratchet exemption for seasonal agricultural customers to include municipal
water pumping customers was not an "unreasonable preference or advantage concerning rates." Tex.
Util. Code Ann. § 36.003. The Commission grounded its decision in a "substantial and reasonable"
difference between the two customers and thus did not unreasonably discriminate against the
municipal water pumping customers. Amtel, 687 S.W.2d at 102. We further hold that the
Commission, by following the rate considerations set forth in PURA, did not act in an arbitrary and
capricious manner in granting the exemption to one customer but not another. Having overruled the
Cities' points of error, we affirm the judgment of the district court.



 __________________________________________

 Jan P. Patterson, Justice

Before Justices Kidd, Patterson and Puryear

Affirmed

Filed: February 27, 2003

1. Tex. Util. Code Ann. §§ 11.001-64.158 (West 1998 & Supp. 2003).
2. Tex. Pub. Util. Comm'n, Generic Issues Associated with Applications for Approval of
Unbundled Cost of Service Rate Pursuant to PURA § 39.201 and Public Utility Commission
Substantive Rule § 25.344, Docket No. 23444 (Nov. 22, 2000) (interim order establishing generic
customer classification and rate design).
3. "Demand" is instantaneous energy usage. Utilities charge most customers on a monthly
basis, but customers using larger amounts of electricity may have meters that track use every fifteen
or thirty minutes. Under the eighty percent demand ratchet, the utility bases the customer's
transmission and distribution billing rate on the greater of current monthly demand or eighty percent
of the customer's monthly demand for the preceding eleven months.
4. Because cotton ginners were the only seasonal agricultural customers in the proceeding,
for clarity and brevity we will refer to them as "cotton ginners."
5. "Headroom" refers to the margin between the "price to beat" and the new retailer's costs
of providing electricity. From January 1, 2002 until January 1, 2007, electric providers formerly
affiliated with regulated utilities must provide electricity at rates that are six percent lower than their
rates before deregulation. This rate is known as the "price to beat." See Tex. Util. Code Ann.
§ 39.202 (West Supp. 2003). In enacting the price-to-beat statute, the legislature intended for new
retail electric providers not affiliated with the regulated utility industry to enter the market and
compete for customers with affiliated retail electric providers, those that were formerly part of the
bundled utility companies. Thus, the greater the headroom, the more a customer may take advantage
of competitive rates.
6. Tex. Pub. Util. Comm'n, Application of West Texas Utilities Company for Approval of
Unbundled Cost of Service Rate Pursuant to PURA § 39.201 and Public Utility Commission
Substantive Rule § 25.344, Docket No. 23544 (Oct. 24, 2001) (final order establishing WTU's
unbundled cost of service rate).
7. We also note that the Cities appealed the Commission's order pursuant to PURA section
15.001, which states that "[a]ny party to a proceeding before the commission is entitled to judicial
review under the substantial evidence rule." Tex. Util. Code Ann. § 15.001 (West 1998) (emphasis
added).
8. The principal definition of "unique" is "the only one," synonymous with "sole." Webster's
Third New International Dictionary 2500 (1986).